OPINION

Per Curiam:

BACKGROUND

At the heart of the underlying dispute is a real property lease to the Marina Hotel & Casino (Marina), formerly located on the southern end of the Las Vegas Strip. Appellant Southwest Securities (Southwest) was the owner and landlord of the Marina.
On October 30, 1973, Southwest executed a hotel lease agreement with Resorts, Inc., a wholly owned subsidiary of Amfac, Inc. (AMFAC), a Hawaii corporation. In that agreement, Resorts agreed to lease the hotel portion of the Marina for thirty years commencing May 1, 1975. Contemporaneously, AMFAC executed a lease guaranty which absolutely guaranteed the faithful *1038 performance of the hotel lease agreement between Southwest and Resorts. The casino portion of the Marina was leased, in a separate agreement, by Southwest to Airport Casino, Inc. (Airport).
On December 31, 1980, Resorts assigned its interest in the hotel lease to Airport. In consideration for Southwest’s consent to the hotel lease assignment, AMFAC executed an additional guaranty confirming that AMFAC’s existing guaranty on the hotel lease remained in full eifect, notwithstanding the assignment of the lease to Airport.
On February 3, 1984, Airport filed a petition for relief under Chapter 11 of the Bankruptcy Code. Unable to succeed as debtor-in-possession, on March 27, 1987, Airport informed the bankruptcy court that it would be “abandoning the premises as early as next week.” Consequently, on April 6, 1987, the bankruptcy court ordered the case converted to a Chapter 7 liquidation proceeding.
In response to that order, the bankruptcy trustees took possession of the Marina. Contemporaneous with possession by the trustees, Southwest and the trustees entered into an operation agreement whereby:
[Southwest] [] agreed to allow the Trustees to operate the Marina in order to mitigate [Airport’s] and certain guarantors damages.
Moreover, it was agreed that the automatic stay would be lifted and the trustees would:
deliver possession of the premises to [Southwest] who will permit the Trustees to operate the premises pursuant to the terms of this Agreement, subject to any right Amfac, Inc. might have to take possession of the Hotel Lease premises. Trustees do hereby tender possession of the Hotel premises to Amfac.
On September 1, 1988, Southwest and the trustees entered into a transition agreement whereby possession of the Marina would be turned over to Southwest when Southwest obtained a gaming license. The trustees continued to operate the hotel and casino until September 30, 1988, when Southwest obtained its gaming license. Thereafter, Southwest operated the Marina until it was sold to MGM Grand, Inc. on January 5, 1990.
Meanwhile, Southwest sued AMFAC in state court for breach of guaranty. The district court ordered summary judgment in favor of AMFAC after concluding that the operation and transition agreements between Southwest and the trustees discharged Airport from further liability; thus, AMFAC as guarantor of *1039 Airport was also discharged from further liability as a matter of law.

LEGAL DISCUSSION

“It is well-settled that guarantors and sureties are exonerated if the creditor alters the obligation of the principal without the consent of the guarantor or surety.” Marion Properties, Ltd. v. Goff, 108 Nev. 946, 948, 840 P.2d 1230, 1231 (1992). Thus, if Southwest, as lessor-creditor, altered the obligation of Airport, the lessee-principal, without the consent of AMFAC, the guarantor, then AMFAC’s obligation as guarantor was exonerated.
Respondents contend that the operation and transition agreements materially altered the hotel lease without their consent in the following ways. First, the hotel lease was for thirty years, commencing on May 1, 1975. The operation agreement commenced on April 6, 1987, did not specify a term, but provided that either party could terminate on five days notice. Second, the hotel lease provided for basic rent of $103,055.75 per month and annual percentage rent of 25% of the lessee’s gross receipts. The operation agreement provided for basic rent of $393,202.27 per month, with no annual percentage rent. Third, the hotel lease required hotel operation to be kept separate from casino operations. The operation agreement provided for the hotel and casino operations to be combined. Fourth, the hotel lease contained extensive provisions with respect to damage, destruction or condemnation of the premises, assignment and subletting, parking, expansion of improvements and default. The operation agreement contained no such provisions. Consequently, respondents contend that the operation agreement substantially and materially altered the terms of the tenancy that Resorts had agreed to, and AMFAC had guaranteed, without their consent. Thus, respondents contend that they were exonerated from further liability on the hotel lease guarantee.
Moreover, respondents contend that under the Uniform Joint Obligations Act, a release or discharge of one co-obligor without express reservation against other co-obligors discharges the others to the extent provided in NRS 101.060. Whittlesea v. Farmer, 86 Nev. 347, 349, 469 P.2d 57, 58 (1970). NRS 101.060(1), in pertinent part, provides:
If an obligee releasing or discharging an obligor without express reservation of rights against a coobligor, then knows or has reason to know that the obligor released or discharged did not pay so much of the claim as he was bound by his *1040 contract or relation with that coobligor to pay, the obligee’s claim against that coobligor shall be satisfied to the amount which the obligee knew or had reason to know that the released or discharged obligor was bound to such coobligor to pay.
Respondents contend that Southwest did not reserve any rights against Airport’s co-obligor, Resorts, or Resorts’ guarantor, AMFAC. Consequently, respondents contend, Resorts and its guarantor, AMFAC, are released from any obligation to Southwest under the hotel lease guaranty.
Conversely, Southwest contends that to the extent that the district court’s decision implies that the agreements between Southwest and the trustees discharged or released Airport from liability for obligations arising from prebankruptcy defaults, the decision was error. These agreements involved, among other things, the payment of rent by the trustees to Southwest. Under a provision of the Bankruptcy Code specially applicable to “nonresidential real property,” Chapter 7 trustees must pay rent to use and occupy “nonresidential real property” that had been occupied by Chapter 7 debtors. 11 U.S.C. § 365(d)(3).[1] Southwest contends that the agreements between itself and the trustees were merely the fulfillment of the trustees’ obligations under 11 U.S.C. § 365(d)(3), and Southwest’s duty to mitigate damages.
Further, Southwest contends that the hotel lease was not terminated or replaced by either the operation or transition agreement. Instead, Southwest contends, the trustees merely represented a new entity, the bankruptcy estate, and by their willingness to pay rent after having achieved emergency gaming license approval from state authorities, presented Southwest with a reasonable opportunity to mitigate potential damages. Moreover, Southwest contends, Nevada law does not espouse the theory that a landlord’s procurement of a mitigation-tenant automatically works a discharge or release of the former occupant, the defaulting lessee, or of any guarantor from liability from past defaults and damages accruing therefrom.
We agree. There is no evidence in the record to support the proposition that Southwest discharged or released Airport from *1041 its liability on the hotel lease or that Southwest altered the obligations of Airport, or of its co-obligor or guarantor on the hotel lease. To exonerate a guarantor from obligation on a guaranty, it must be shown that the creditor and the principal altered the agreement that was guaranteed without the consent of the guarantor. Marion Properties, Ltd. v. Goff, 108 Nev. 946, 948, 840 P.2d 1230, 1231 (1992); Williams v. Crusader Disc. Corp., 75 Nev. 67, 70-72, 334 P.2d 843, 846 (1959). In the instant case, there is no evidence that the principal, Airport, entered into an agreement with anyone. Airport simply surrendered its interest in the hotel lease to the trustees, as required under the bankruptcy code. It did nothing else. Thus, under Marion Properties and Williams, AMFAC was not discharged from its obligation under the lease guaranty.
Absent proof that Airport, the principal, participated in an alteration of the hotel lease, respondents look to the agreements entered into by the trustees to exonerate their obligation under the lease guaranty. However, those agreements were not intended to alter the hotel lease.[2] Instead, the trustees were merely fulfilling their statutory duty and paying rent and expenses for occupying the hotel premises.

CONCLUSION

We conclude that Southwest did not alter the hotel lease it had with Airport. Airport surrendered its interest in that lease to the bankruptcy trustees. The bankruptcy code requires the trustees to compensate a landlord of nonresidential real property for occupying its premises. Moreover, Southwest had a duty to mitigate Airport’s and its guarantor’s damages. This was the essence of the operation agreement between Southwest and the trustees. There is no evidence in the record that Southwest discharged or released Airport from its liability under the hotel lease. Since Airport was not discharged from its liability, neither were its co-obligor or guarantor.
Consequently, we conclude that genuine issues of material fact exist as to respondents’ breach of the lease guaranty. Accordingly, the district court’s order of summary judgment is reversed and this case is remanded to the district court for proceedings consistent with this opinion.[3]
*1042 Rose, C. J., Steffen and Springer, JJ., and Adams, D. J.[4]

 11 U.S.C. § 365(d)(3) (1984), in pertinent part, provides:
The trustee shall timely perform all the obligations of the debtor . . . arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected

 In an affidavit submitted to the district court, the trustees’ attorney, Lenard E. Schwartzer, stated that “neither [the Operation nor the Transition] Agreements] was intended to effect a release of [Airport], [Resorts] or [AMFAC].”

 The Honorable Miriam Shearing, Justice, voluntarily recused herself from participation in the decision of this appeal.